# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-1545

UNITED STATES OF AMERICA

v.

ZACHARY WILLIAMS,
Appellant

_____

On Appeal from the U.S. District Court, D.N.J.
Judge Christine P. O'Hearn, No. 1:22-cr-00325-001

Before: RESTREPO, BIBAS, and PHIPPS, *Circuit Judges*
Submitted: Apr. 22, 2026; Decided: June 30, 2026
_____

OPINION OF THE COURT

BIBAS, *Circuit Judge*. A man who represents himself has a fool for a client. But the Constitution lets him do that so long as he is fully informed of the consequences of doing so, and still freely chooses it.

Zachary Williams decided to go pro se after he was arrested for sexually abusing a 13-year-old girl and making and possessing child pornography. The District Court took pains to ensure that he understood the consequences of his decision, but it misinformed him of the maximum penalty on one of his five charges. Even so, Williams knew that he was facing a functional life sentence and that he might get slapped with

enhanced penalties up to and including life; indeed, he repeatedly told the judge and jury during trial that he was facing a life sentence. Now, Williams attacks his conviction, arguing that the District Court's mistake made his waivers of his right to counsel uninformed. He also claims that his waivers were involuntary and challenges the District Court's decision to admit certain pieces of evidence against him. Because all his challenges are meritless, we will AFFIRM. In doing so, we clarify when courts may look at the whole record to confirm that a defendant has validly waived his right to counsel.

## I.     AFTER ABUSING GIRLS, WILLIAMS DECIDES TO REPRESENT HIMSELF

Through social media, Williams met girls aged 11, 13, and 14, and got them to text him nude photos and other sexual images over Snapchat and Instagram. He then extorted the girls into meeting and having sex with him. When his 13-year-old victim, A., told her family what Williams had done to her, undercover officers took over her social-media accounts, posing as her. Williams then arranged to meet her at a hotel room; when he got there, officers arrested him and seized his iPhone, Viagra, contraceptives, and lubricants. Based on that conduct, a grand jury indicted him on two counts of traveling interstate to have sex with a minor; one count of sexual exploitation of a child by making child pornography; one count of coercion and enticement of a child to have sex; and one count of possession of child pornography. 18 U.S.C. §§ 2423(b), 2251(a) & (e), 2422(b), 2252A(a)(5)(B) & (b)(2).

In the months following his arrest in March 2021, Williams did everything possible to delay his case. After the court appointed

a federal defender to represent him, Williams accused her of not "hav[ing] his best interest in mind," leading her to seek replacement counsel. JA 220. But after a magistrate held a hearing on the motion, Williams seemingly changed his mind and withdrew his request for a new lawyer. A year later, Williams again flip-flopped and decided that his lawyer had "misled him into a proffer" and was representing him ineffectively. JA 516. That time, the District Court granted the federal defender's motion to withdraw and appointed new counsel, who promptly asked the court to assess Williams's competency. Williams refused to meet with a psychologist, causing more delays. (Even so, the District Court concluded that Williams was competent.) Then, Williams complained that his second court-appointed lawyer was also ineffective and requested a third. When the District Court denied that request in February 2023, Williams asked to proceed pro se.

The District Court scheduled a *Faretta* hearing and held a thorough colloquy with Williams to ensure that he was waiving his Sixth Amendment right to counsel knowingly and voluntarily. *Faretta v. California*, 422 U.S. 806, 821 (1975); *see also United States v. Peppers*, 302 F.3d 120, 132 (3d Cir. 2002) (laying out the so-called *Peppers* colloquy, which details what a court must cover during a *Faretta* hearing). At the hearing, the District Court went over the maximum penalties Williams would face if he was convicted on each count. The judge correctly informed Williams of the maximum sentences on four of the five counts, as well as potential enhanced penalties on two of them. But relying on the government's erroneous submission, the District Court mistakenly told Williams that the maximum penalty he faced on the coercion-and-enticement count

3

was ten years. In truth, it was life. *See* 18 U.S.C. §2422(b). After completing the *Peppers* colloquy, the District Court granted Williams's request to go pro se—but required his appointed lawyer to stay on as standby counsel. (A court appoints standby counsel so that a lawyer is available "if and when the accused requests help," to take over "if the accused wishes to terminate his own representation," to "explain and enforce the basic rules of courtroom protocol to the accused," and to "overcome routine obstacles that may hinder effective *pro se* representation." *United States v. Bertoli*, 994 F.2d 1002, 1019 (3d Cir. 1993).)

Williams promptly exploited his pro se status to drag out discovery, possibly to get a better plea offer from the government—or maybe so he could watch the child pornography that the government had seized from his phone. Because Williams could not review that material in jail, the government set up a secure room with a computer in another federal building and brought him there for "[39] different sessions" spanning "158 hours." JA 401. Apparently, Williams did not spend much (if any) of that time preparing his defense. Instead, he "watch[ed] over and over again the same videos involving sexual relations with minors" and "then disappear[ed] and t[ook] … bathroom break[s]," sometimes for as long as fifteen minutes. JA 404. In December 2023, the District Court entered a protective order sharply limiting his access to that material, concerned that further "discovery" would inflict more harm on Williams's victims.

All the while, Williams harassed his standby counsel, asking him to "do … things … [outside] the scope of [his] obligations," getting "angry with [him]" when he refused to comply,

4

and subjecting him to an "expletive laced tirade." Supp. App. 2650. Counsel moved to be relieved, and in March 2024 the District Court held a hearing on the motion. There, Williams flip-flopped no fewer than "eight times … in less than an hour" about whether he wanted to continue representing himself or withdraw his pro se status (and let standby counsel assume his defense). JA 517. Eventually, Williams decided to withdraw his pro se status—but only after the District Court made clear that if he did so, the court would give his counsel two extra weeks to respond to several government motions that had been pending for months without Williams filing oppositions. *See* Fed. R. Evid. 413, 414.

In June 2024, with Williams again represented by counsel, the District Court granted the government's motion to admit evidence of the other sexual abuse. Williams promptly asked to represent himself once more. The District Court scheduled a second *Faretta* hearing and conducted another fulsome *Peppers* colloquy, when it again mistakenly told Williams that his maximum sentence on the coercion-and-enticement count was ten years. Though the District Court at first denied Williams's request to go pro se because it "[wa]s nothing more than a delay tactic," it reconsidered at the government's urging and let Williams represent himself at trial with his appointed lawyer as standby counsel. JA 624.

Four years after Williams's arrest, the case finally went to trial. There, the District Court patiently and carefully tried to keep Williams in line while respecting his right to represent himself. Williams still shouted at the judge and asked witnesses repetitive questions after he was warned to stop. He also harangued minor victim A. on the stand and made improper

arguments to the jury. At the close of evidence, Williams withdrew his pro se status, and standby counsel gave closing argument. After deliberating for less than an hour, the jury convicted Williams on all five counts.

On the eve of sentencing, the government realized that it had misinformed the District Court of Williams's sentencing exposure on the coercion-and-enticement count and confessed error. Williams moved for a new trial, arguing that his waivers of the right to counsel were neither knowing nor voluntary, as he had been misadvised that he was facing only ten years on that count. See Fed. R. Crim. P. 33(a). The District Court denied the motion, concluding that the rest of Williams's *Peppers* colloquies revealed that he knew full well that he might spend the rest of his life in prison and that the remainder of the record reenforced that conclusion. Then it sentenced him to life in prison. On appeal, Williams challenges the District Court's denial of his motion for a new trial, as well as its decisions to admit chat messages that Williams sent to undercover officers posing as A. and evidence of his sexually abusing two other girls. All three challenges fail.

## II. THE COURT PROPERLY DENIED A NEW TRIAL

Williams first argues that he should get a new trial because his waivers of the right to counsel were ineffective. The record facts are undisputed; we review de novo the District Court's legal conclusion that Williams's waivers were effective. *Peppers*, 302 F.3d at 127.

The Sixth Amendment gives a criminal defendant the right to "the Assistance of Counsel for his defence." But it also "grants to the accused *personally* the right to make his

6

defense." *Faretta*, 422 U.S. at 819 (emphasis added). If a defendant decides to exercise that latter right, his waiver must be both knowing and voluntary—he must be fully informed of the consequences of his choice, and the decision must be his alone. *See United States v. Jones*, 452 F.3d 223, 228 (3d Cir. 2006). To ensure that those requirements are met, we have listed various matters that district courts must review with defendants before letting them go pro se, which has come to be known as the "*Peppers* colloquy." *See Peppers*, 302 F.3d at 132; *United States v. Taylor*, 21 F.4th 94, 101 n.5 (3d Cir. 2021). We have also laid out a suggested "framework" comprising fourteen questions that adequately cover those matters. *Peppers*, 302 F.3d at 136.

Even so, there is no "talismanic formula for the [district] court's inquiry" so long as the defendant is "informed of *all* risks and consequences associated with his decision for self-representation." *Id.* at 135. And we assess the adequacy of a waiver with an eye towards "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). But if it turns out that a defendant's waiver was either unknowing or involuntary, there is no harmlessness review: The error is structural and the defendant is entitled to a new trial. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984); *United States v. Stubbs*, 281 F.3d 109, 121 (3d Cir. 2002).

Williams says he should get a new trial because his waivers were both unknowing and involuntary. They were neither.

### A.  Williams's Sixth Amendment waivers were knowing

For a defendant's waiver to be knowing, a trial court must inform him of "the nature of the charges, the range of possible punishments, potential defenses, technical problems that [he] may encounter, and any other facts important to a general understanding of the risks involved." *Peppers*, 302 F.3d at 132 (quoting *Gov't of V.I. v. Charles*, 72 F.3d 401, 404 (3d Cir. 1995)). Williams argues that his waivers were unknowing because at both of his *Faretta* hearings, the District Court incorrectly advised him that he was facing a maximum sentence of ten years (rather than life) on the coercion-and-inducement charge.

But not every mistake made during a *Faretta* hearing or a *Peppers* colloquy renders a defendant's waiver unknowing. *See United States v. Moskovits*, 86 F.3d 1303, 1307 (3d Cir. 1996) (noting that a trial court's failure to inform a defendant of the "range of punishment" at a *Faretta* hearing may not render a waiver unknowing if the defendant was "aware" of the information already). If other information suggests that a defendant was not misled by the mistake, then the waiver remains effective and there is no structural error. *See United States v. Thomas*, 357 F.3d 357, 364 (3d Cir. 2004) ("Although in … [*Peppers*] we listed a series of questions that we believe would provide a 'useful framework' in order to ascertain whether a defendant understands the risks of proceeding *pro se,* we did not … mandate a certain 'script,' especially in situations where we were confident that the defendant was cognizant of the potential problems he would face.").

*1.  Williams's* Faretta *hearings show that his waivers were knowing.* In the typical case, the substance of a defendant's

8

*Faretta* hearing is the key to assessing whether he was misled by a district-court error. *See Jones*, 452 F.3d at 232. In explaining why we would not consider events that took place more than a year before the *Faretta* hearing, we have "reject[ed] the approach of some of our sister Circuits that allows examination of the record as a whole in an attempt to divine what the defendant understands about the consequences of proceeding *pro se*," reasoning that "[a] complete, on-the-record colloquy with the defendant … is … a significantly better way of protecting the right to counsel." *Id. But see, e.g.*, *Ferguson v. Bruton*, 217 F.3d 983, 985 (8th Cir. 2000) (per curiam) (letting courts review the whole record to determine that "the defendant had [the] required knowledge from other sources"); *United States v. Singleton*, 107 F.3d 1091, 1098 (4th Cir. 1997) (similar). At the same time, we have recognized that "a court may employ tools other than direct questioning if the circumstances call for them." *United States v. Taylor*, 21 F.4th 94, 102–03 (3d Cir. 2021).

We have no difficulty concluding that Williams's waivers were knowing based solely on the record of his two *Faretta* hearings. At both, the District Court conducted model *Peppers* colloquies, using our suggested list of questions and exhaustively reviewing all the required information (and more) with Williams. And though the District Court misadvised Williams of the maximum penalty he faced on the coercion-and-inducement count, it correctly informed him that he risked getting up to thirty years on each of the two interstate-travel counts, thirty years on the child-pornography production count, and twenty years on the child-pornography possession count, and that those sentences might run consecutively to one another. In other words, the District Court told Williams that he was facing a maximum of

120 years in prison—the functional equivalent of a life sentence for a defendant in his mid-thirties. *Cf. United States v. Cruz-Rivera*, 137 F.4th 25, 27 (1st Cir. 2025) (noting that 72-year sentence was functionally life for 41-year-old defendant). If that was not enough, the District Court also informed Williams that he might face enhanced penalties up to life in prison on one of the child-pornography counts if he had prior convictions for child sex crimes at the time of sentencing (a real possibility given that Williams was simultaneously fighting charges in other courts relating to the other two girls whom he had sexually abused).

Those exchanges make Williams's case a far cry from *Booker*, where we found a defendant's waiver invalid after the district court failed to advise him of a mandatory minimum sentence on one of his charges, the potential maximum sentence of life on the same charge, and the statutory requirement that whatever sentence he got would run consecutively to sentences on his other charges. *See United States v. Booker*, 684 F.3d 421, 427 (3d Cir. 2012). The judge's mistakes cumulatively "result[ed] in a twenty-year understatement of the amount of mandatory imprisonment facing [the defendant], if convicted." *Id.* at 428. The District Court made no such understatement here: There is no practical difference between a 120-year and a life sentence. Plus, the District Court told Williams that he might get life if he had qualifying prior convictions. Our precedents merely require informing a defendant of the "range of possible punishments" he might face if convicted on all counts. *Peppers*, 302 F.2d at 132. Based on Williams's *Faretta* hearings alone, we conclude that the District Court satisfied that requirement and that Williams's waivers were knowing.

*2. The rest of the record confirms that Williams's waivers were knowing.* But this is not a typical case, so we do not restrict our review to Williams's *Faretta* hearings alone. We have looked beyond the four corners of a hearing transcript, as when we suspected that a defendant "sought to proceed *pro se* for an improper purpose, such as to delay trial." *Jones*, 452 F.3d at 233. In *United States v. McFadden*, for example, the defendant was given "[t]wo competent criminal lawyers" but "refused to accept their advice." 630 F.2d 963, 972 (3d Cir. 1980). Instead, he "employ[ed] complaints against counsel as a dilatory tactic in order to postpone trial, raise a Speedy Trial Act claim, or await possible death or unavailability of prosecution witnesses." *Id.* On the eve of trial, he asked to go pro se. *Id.* at 967. The trial judge held a *Faretta* hearing and granted the defendant's request but failed to inform him of "the nature of the charges and the range of punishment." *Id.* at 972. Even so, we concluded that the defendant's waiver was knowing, since a review of the record revealed that he had received the required information "numerous times" prior to the hearing. *Jones*, 452 F.3d at 233 (discussing *McFadden*).

Read together, *Jones* and *McFadden* adopt a straightforward rule. At least when a defendant asks to represent himself as a delaying tactic or to bait structural error, the *Faretta* hearing transcript—with its scripted, formulaic questions and answers—may not tell the entire story. In such a case, courts may take a more flexible approach and consider whether the whole record reveals that the defendant's choice was fully informed. To be sure, in the mine-run of cases, a court should evaluate the effectiveness of a waiver by focusing on the *Faretta* hearing rather than "engag[ing] in an after-the-fact, subjective determination

11

of what information did or did not influence [the defendant's] decision" to represent himself. *Booker*, 684 F.3d at 428. And district courts are still required to apprise defendants of "all risks and consequences associated with [the] decision for self-representation"; failure to mention "just one" of the required elements of a *Peppers* colloquy may well be reversible error. *Peppers*, 302 F.3d at 135. We simply emphasize that where a defendant has asked to go pro se in bad faith and the district court has conducted the "penetrating and comprehensive examination" that *Peppers* requires, but the colloquy nevertheless contains a mistake, we will review the whole record before concluding that the defendant's choice was uninformed. *Id.* We apply that flexible approach cautiously to ensure that a defendant who asked to represent himself in order to sandbag the government or the district court will not be rewarded with a new trial merely for identifying a technical issue with his *Faretta* hearing.

Though unnecessary to our conclusion that Williams's waivers were knowing, looking at the whole record is proper here. Williams's conduct before the District Court confirms that he sought to represent himself for a manifestly improper purpose: to do "everything possible to delay and obstruct the proceedings." Supp. App. 2924. Early on, he wielded his pro se status to slow down pretrial proceedings and discovery (perhaps to get a good plea deal, perhaps to keep watching the child pornography that the government had seized from him). Later, he sought to grind his trial to a halt by asking repetitive questions on cross-examination, shouting at the judge, and, when all that failed, refusing to return to the courtroom after he had been removed for one of his outbursts. Williams's reasons for going pro se were thus at least as inappropriate as those of the

*McFadden* defendant, who sought to "postpone trial" and perhaps manufacture a "Speedy Trial Act claim" or wait out the "possible death or unavailability of prosecution witnesses." *McFadden*, 630 F.2d at 972. In these circumstances, we do not restrict our review to Williams's *Faretta* hearings.

Even the most cursory look at the entire record confirms that Williams knew he was facing a life sentence. At trial, Williams said "I'm facing a life sentence" or the like nine times. He made statements along those lines five times while cross-examining his victim alone. *See* Supp. App. 1205 ("I'm facing a life sentence … I'm facing … life."); Supp. App. 1208 ("Your Honor, I'm facing a life sentence, Your Honor…. I'm facing a life sentence, Your Honor. She has to tell the truth, Your Honor."); Supp. App. 1272 ("Your Honor, I'm facing a life sentence here…. I'm getting a life sentence…. I'm getting a life sentence and I didn't rape her."); Supp. App. 1273 ("Your Honor, I'm facing a life sentence."). These comments further assure us that Williams's waivers were knowing.

## B. Williams's Sixth Amendment waivers were voluntary too

To be effective, a waiver must also be the product of a defendant's "informed free will." *Faretta*, 422 U.S. at 835. A defendant's "motives" for asking to go pro se, and specifically, whether a defendant had strategic reasons for wishing to represent himself, are relevant to assessing whether he made his choice freely. *Stubbs*, 281 F.3d at 117; *cf. United States v. Konigsberg*, 336 F.2d 844, 851 (3d Cir. 1964) (noting that a defendant "represented by counsel [may] waive[] [the] right [to counsel] for strategic purposes"). Williams says he asked to

go pro se due to "pressure from the court, the government and counsel," making his waivers involuntary and independently warranting a new trial. Appellant's Br. 24. But the record reveals otherwise.

At the outset, neither the District Court, nor the government, nor Williams's own attorney pressured him into representing himself. The District Court carefully balanced Williams's right to a lawyer against his right to handle his own defense. It kept his appointed counsel on standby and continually reminded Williams that court-appointed counsel was available. After he asked to go back to relying on counsel, the District Court granted his request. Finally, when Williams again asked to represent himself on the eve of trial, the District Court at first *denied* that request, before reconsidering to honor Williams's choice. So nothing in the record suggests that anyone pressured Williams to assume his own defense.

In fact, Williams asked to go pro se to slow down the proceedings as much as possible, and perhaps to do things that none of his lawyers would agree to do for him. While cross-examining his victim, for instance, he tried—in direct defiance of one of the District Court's orders—to interrogate her about her sexual history. He also asked her inappropriate and irrelevant questions about whether she enjoyed having sex with him and whether her mother was her biological parent. And he sought to gain the jury's sympathy by repeatedly hammering that he was facing life in prison, even though juries ordinarily may not consider the punishment a defendant might receive when assessing guilt. *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993) (Alito, J.). Though those efforts failed, they still reflect Williams's strategic judgment that representing himself

14

would be more effective than relying on a lawyer. So Williams's waivers of the right to counsel were voluntary and the District Court rightly denied his motion for a new trial.

### III. THE MESSAGES TO THE UNDERCOVER OFFICERS WERE ADMISSIBLE

Next, Williams argues that the District Court should have suppressed his chat messages to undercover officers posing as A. because they violated both federal and New Jersey law. We review the court's factual findings for clear error and its legal conclusions de novo. *United States v. Montalvo-Flores*, 81 F.4th 339, 342 (3d Cir. 2023).

*First*, Williams says that the federal Wiretap Act banned intercepting and recording the chats because the officer was impersonating someone else. But the Act carves out an exception "where such person is a party to the communication," and that exception applies to undercover impersonators. 18 U.S.C. §2511(2)(c); *see In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143–44 (3d Cir. 2015); *United States v. Griggs*, 54 F.4th 531, 535–36 (8th Cir. 2022). So there was no Wiretap Act violation.

*Second*, Williams claims that the chats should have been suppressed under New Jersey's Wiretapping and Electronic Surveillance Act. But because the chats were lawfully obtained pursuant to federal law, it does not matter whether they violated state law. *See United States v. Armocida*, 515 F.2d 49, 52 (3d Cir. 1975). And even if New Jersey's Act could trump the federal Wiretap Act, it too excepts law enforcement officers who are parties to a communication. N.J. Stat. Ann. §2A:156A-

4(b). So the evidence found through the undercover chats was admissible under state law as well.

## IV. THE EVIDENCE OF WILLIAMS'S OTHER CRIMES WAS ADMISSIBLE TOO

Finally, Williams quibbles with the District Court's decision to admit evidence that he had sexually abused the 11- and 14-year-old girls, arguing that it violated the Federal Rules of Evidence and the Sixth Amendment's Confrontation Clause. We review the District Court's application of the evidentiary rules for abuse of discretion and Williams's Confrontation Clause challenge de novo. *United States v. Noble*, 42 F.4th 346, 352 & n.3 (3d Cir. 2022); *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998).

The Rules-based challenge fails. As Williams's lawyer conceded below, the government's evidence of his other crimes was intrinsic to the child-pornography possession count (charging possession of three videos, one of them of a child under 12). And on the other four counts, evidence of other child sexual abuse was presumptively admissible because Williams was charged with committing each of those crimes around the same time and in similar ways. *See* Fed. R. Evid. 413(a), 414(a); *Noble*, 42 F.4th at 352–53. Plus, the District Court did not abuse its discretion in admitting that evidence after finding that it was relevant and that its probative value outweighed the risk of unfair prejudice. *See* Fed. R. Evid. 403. What is more, the government used redacted snippets from only seven images, and the court gave limiting instructions, capping any prejudice.

Williams's Confrontation Clause challenge, which focuses on videos recovered from his phone showing him sexually

abusing the other two girls, fares no better. Those videos were not made in anticipation of trial, so they were not testimonial and there was no Confrontation Clause problem with admitting them. *See Crawford v. Washington*, 541 U.S. 36, 51–52 (2004).

\* \* \* \* \*

A criminal defendant may represent himself if he so chooses. But he may not abuse his pro se status to delay trial or manufacture grounds for appeal. Williams tried to do just that. We refuse to reward his chicanery with a new trial just because the District Court erroneously advised him of his sentencing exposure on one of his charges. Instead, we review the whole of his *Faretta*-hearing transcripts and conclude that he knew he was facing a life sentence or its functional equivalent. We also hold that because Williams sought to go pro se to obstruct and delay, looking at the remainder of the record is appropriate, and that the whole record here further supports the knowingness of Williams's waivers. We easily conclude that the waivers were voluntary too. And we reject Williams's evidentiary challenges. We will thus AFFIRM his conviction and sentence.

*United States v. Williams*, No. 25-1545
PHIPPS, *Circuit Judge*, concurring in the judgment as to
Part II.

Part II of the Majority Opinion limits the assessment of a
criminal defendant's knowledge for purposes of a request for
self-representation to only the record of the *Faretta* hearing
except for improper-purpose requests. That deviates from
every other federal appellate court to have considered this
issue; they all use a whole-record approach generally – not just
for improper-motive requests.[1] The Majority Opinion rejects

---

[1] *E.g.*, *United States v. Jones*, 778 F.3d 375, 389 (1st Cir. 2015)
("[T]he efficacy of the court's *Faretta* warning must be
evaluated on the basis of the record as a whole. We will uphold
a waiver of the right to counsel as long as the record supports
a reasoned conclusion that the defendant was fully apprised of
his right to counsel and of the disadvantages he would
encounter should he elect to proceed pro se."); *Dallio v.
Spitzer*, 343 F.3d 553, 563 (2d Cir. 2003) ("[W]e have[] . . .
also rejected rigid waiver formulas or scripted procedures[] . . .
and emphasized that 'knowing and intelligent' waivers depend
on the totality of the circumstances." (quoting *United States v.
Fore*, 169 F.3d 104, 108 (2d Cir. 1999))); *United States v.
Roof*, 10 F.4th 314, 359 (4th Cir. 2021) (relying not "on the
*Faretta* colloquy alone" and instead conducting a "review of
'the record as a whole'" (quoting *United States v. Singleton*,
107 F.3d 1091, 1097 (4th Cir. 1997))); *United States v.
Sterling*, 99 F.4th 783, 794 (5th Cir. 2024) ("Because of the
vast differences from case to case, and defendant to defendant,
a district court must consider the totality-of-circumstances in
determining whether a defendant has properly waived his right
to counsel." (quoting *United States v. Virgil*, 444 F.3d 447, 453
(5th Cir. 2006))); *King v. Bobby*, 433 F.3d 483, 492 (6th Cir.
2006) ("[I]t is a reasonable application of *Faretta* and *Von
Moltke* to look at the whole record, not just the colloquy
immediately before the signing of the waiver, to determine if it
was knowing and intelligently entered."); *United States v.*

1

the general applicability of the whole-record approach based on a passage in *United States v. Jones*, 452 F.3d 223 (3d Cir. 2006):

> [W]e reject the approach of some of our sister Circuits that allows examination of the record as a whole in an attempt to divine what the defendant understands about the consequences

*Underwood*, 88 F.4th 705, 709 (7th Cir. 2023) ("We consider four factors when evaluating whether a defendant knowingly and voluntarily waived the right to counsel, considering the record as a whole."); *United States v. Heard*, 951 F.3d 920, 928 (8th Cir. 2020) ("This court 'will uphold a waiver of counsel absent specific warnings when the record as a whole demonstrates that the defendant knew and understood the disadvantages of self-representation.'" (quoting *Fiorito v. United States*, 821 F.3d 999, 1006 (8th Cir. 2016))); *United States v. Schaefer*, 13 F.4th 875, 887 (9th Cir. 2021) ("[T]he focus of our analysis . . . is whether 'a fair reading of the record as a whole' indicates that the defendant 'understood the dangers and disadvantages of self-representation.'" (quoting *United States v. Audette*, 923 F.3d 1227, 1235 (9th Cir. 2019))); *United States v. Hansen*, 929 F.3d 1238, 1251 (10th Cir. 2019) ("[O]ur cases have repeatedly stressed that the knowing and intelligent nature of the waiver of the right to counsel turns on the 'totality of the circumstances, including the background, experience, and conduct of the defendant.'" (quoting *United States v. Williamson*, 806 F.2d 216, 220 (10th Cir. 1986))); *United States v. Stanley*, 739 F.3d 633, 646 (11th Cir. 2014) (looking to "the whole record" to ascertain whether a criminal defendant's waiver of the right to counsel was valid); *United States v. Klat*, 156 F.3d 1258, 1265 & n.8 (D.C. Cir. 1998) (holding that, although "the district court failed to engage [the defendant] in a sustained colloquy concerning the dangers and disadvantages of representation," "the record as a whole establishe[d] that [the defendant's] waiver of counsel was knowing, intelligent, and voluntary").

of proceeding *pro se.* A complete, on-the-record colloquy with the defendant, one that assures he understands all the risks of proceeding without an attorney at the time he makes that choice, is in our view a significantly better way of protecting the right to counsel than the whole-record approach.

*Id.* at 232.

But *Jones* itself went too far. Since 1938, the Supreme Court has considered the totality of circumstances in evaluating the validity of a defendant's waiver of counsel. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."). And the Supreme Court has repeatedly reaffirmed that totality-of-the-circumstances approach.[2] Indeed, the Supreme Court has made clear that it has not "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," but that the assessment of

---

[2] *E.g.*, *Faretta*, 422 U.S. at 835 ("The record affirmatively shows that [the criminal defendant] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will."); *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) ("[A] knowing and intelligent relinquishment . . . depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" (quoting *Johnson*, 304 U.S. at 464)); *Iowa v. Tovar*, 541 U.S. 77, 88 (2004) (emphasizing that "[t]he information a defendant must possess in order to make an intelligent election[] . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding").

a criminal defendant's waiver of the right to counsel depends on "a range of case-specific factors." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). Those factors did not limit the inquiry to only the information gleaned in a colloquy. Instead, they included "the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* Tellingly, the Supreme Court's instruction to account for the "stage of the proceeding" suggests that prior events in the proceeding may bear on the assessment of a criminal defendant's knowledge for purposes of requesting self-representation. *Id.*

Additionally, this Court's precedents, both before and after *Jones*, consider the totality of circumstances when determining whether a defendant's waiver of counsel was knowing, voluntary, and intelligent. For instance, this Court has explicitly declined "to require a detailed list of advice such as that mandated for guilty plea proceedings," *Gov't of Virgin Islands v. James*, 934 F.2d 468, 473 (3d Cir. 1991), because the waiver's validity "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused," *id.* at 474 (quoting *Piankhy v. Cuyler*, 703 F.2d 728, 730 (3d Cir. 1983)). This Court has described the *Peppers* colloquy as a "useful framework" but clarified that *Peppers* "did not overrule our previous discussion, nor . . . mandate a certain 'script,' especially in situations where we were confident that the defendant was cognizant of the potential problems he would face." *United States v. Thomas*, 357 F.3d 357, 364 (3d Cir. 2004). Moreover, this Court has emphasized that "a court may employ tools other than direct questioning if the circumstances call for them," because, as *Peppers* itself stated, "there is no talismanic formula for the court's inquiry." *United States v. Taylor*, 21 F.4th 94, 102–03 (3d Cir. 2021) (quoting *United States v. Peppers*, 302 F.3d 120, 135 (3d Cir. 2002)).

That binding contrary caselaw, along with the precedent of every other appellate court to have considered the issue, *see*

4

*supra* note 1, presents strong evidence of a misstep. No other appellate court has needed to craft an improper-purpose exception to broaden review of self-representation requests by criminal defendants because every other court uses whole-record review. Thus, the substance of the exception is not the problem; whole-record review is appropriate in improper-purpose cases. Rather, the problem is that the Majority Opinion treats whole-record review as a specific exception instead of the general rule.

For these reasons, in my view, whole-record review is the approach for assessing the validity of a criminal defendant's request for self-representation – not just an exception for improper-purpose requests. Accordingly, I join the Majority Opinion in all respects except for Part II with which I respectfully concur only in the judgment.

*Counsel for Appellant*

Mark W. Catanzaro

*Counsel for Appellee*

Mark E. Coyne
Richard J. Ramsay
U.S. Attorney Office